## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CARLEOUS DARRELL CLAY (18864-040), | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17 C 6461 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| LIEUTENANT WILLIAMS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Carleous Darrell Clay took an employee of the U.S. Bureau of Prisons hostage when he was incarcerated in the Chicago Metropolitan Correctional Center, awaiting trial on federal charges of kidnapping, rape, and attempted murder. He held a knife to her throat, and threatened to kill her. BOP officers, including Defendant Lt. Carl Williams ("Williams"), intervened, rescued the victim, and restrained Clay. Clay later sued.

Clay brought this suit *pro se* under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), claiming that Williams had violated his constitutional rights by using excessive force and destroying some of his property (his MP3 player). The Court allowed the complaint to proceed past screening (in part) under 28 U.S.C. § 1915A because the facts of the complaint warranted discovery into the reasonableness of Williams's conduct.

That investigation into the underlying facts is now complete. At this stage, the question is whether the undisputed material facts entitle Williams to judgment in his favor. For the reasons discussed below, the Court grants Defendant's motion for summary judgment.

**Background**

The Local Rules require parties to follow a specific procedure when filing and opposing a motion for summary judgment. All litigants – including *pro se* litigants – must follow the Local Rules, or face the consequences of non-compliance. Clay is no exception.

Local Rule 56.1 governs the procedures for filing and responding to summary judgment motions. Local Rule 56.1(a)(3) requires the moving party to provide a "statement of material facts as to which the moving party contends there is no genuine issue" for trial. *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (quoting Local Rule 56.1(a)). "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." *See* Local Rule 56.1(b)(3)(C); *see also Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004).

To defeat summary judgment, the opposing party must "file 'a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon.'" *Cracco*, 559 F.3d at 632 (quoting Local Rule 56.1(b)(3)(B)). "[M]ere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material." *Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003).

Next, if the opposing party wants the Court to consider additional facts – meaning facts *not* presented by the moving party – he must submit them in a specific way. The non-moving party must file a "separate statement 'consisting of short numbered paragraphs[] of any additional facts that require the denial of summary judgment[.]'" *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008) (quoting Local Rule 56.1(b)(3)(C)). Any additional facts

introduced by the opposing party must be supported by "references to the affidavits, parts of the record, and other supporting materials relied upon." *See* Local Rule 56.1(b)(3)(C).

Substantial compliance with Local Rule 56.1 is not enough. *See Ammons,* 368 F.3d at 817. The Court can require the parties, including *pro se* parties, to comply with Local Rule 56.1. *See Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015); *see Collins v. Illinois*, 554 F.3d 693, 697 (7th Cir. 2009) ("even pro se litigants must follow procedural rules").

Consistent with the Local Rules, Defendant Williams filed a statement of undisputed facts with his motion for summary judgment. *See* Def.'s Local Rule 56.1(a)(3) Stmt. ("Statement of Facts") (Dckt. No. 52). He supported each fact in his Statement of Facts with admissible evidence in the record. He also served on Clay a Local Rule 56.2 Notice that explained the requirements of Local Rule 56.1. *See* Dckt. No. 53.

In response, Clay filed two documents. The first is a response to Defendant's Statement of Facts in which Clay either admits or denies each statement, by paragraph number. *See* Pl.'s Local Rule 56.1(b)(3)(B) Resp. ("Pl.'s Resp.") (Dckt. No. 56). The second is a three-page letter which serves as his response brief. *See* Pl.'s. Mem. of Law ("Pl.'s Mem.") (Dckt. No. 57).

Clay's handwritten response to the Statement of Facts was short – only two pages long. *See* Pl.'s Resp. (Dckt. No. 56). He admitted some of the paragraphs. *See, e.g., id.* at 1 (admitting paragraphs 2-15). When he did disagree, he cited no admissible evidence. He simply gave his own version of the events, supported by nothing. For example, in response to paragraph 16, he admits that he had a "knife in hand," but denies that he put it against the victim's throat. *Id.*

Clay's response fails to comply with Federal Rule of Civil Procedure 56(c) and Local Rule 56.1(b)(3). *See* Fed. R. Civ. P. 56(c)(1) (requiring any party asserting or disputing a fact to

"cit[e] to particular parts of materials in the record" or "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact"); Local Rule 56.1(b)(3) (requiring any party opposing a motion for summary judgment to support any asserted factual disagreements with "specific references to the affidavits, parts of the record, and other supporting materials relied upon"). Clay's raw statements, without any evidentiary support, do not create disputed questions of fact for purposes of this motion.

True, Clay is proceeding *pro se*, and the Court would be prepared to give him some latitude if his response was in the ballpark. But a wholesale abandonment of the Rules is a bridge too far, even for a *pro se* litigant. *See McNeil v. United States*, 508 U.S. 106, 113 (1993) ("[W]e have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel[.]") (citations omitted); *Coleman v. Goodwill Indus. of Se. Wis., Inc.*, 423 F. App'x 642, 643 (7th Cir. 2011) ("Though courts are solicitous of pro se litigants, they may nonetheless require strict compliance with local rules."); *Wilson v. Kautex, Inc.*, 371 F. App'x 663, 664 (7th Cir. 2010) ("[S]trictly enforcing Local Rule 56.1 was well within the district court's discretion, even though Wilson is a pro se litigant[.]") (citations omitted); *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006) ("[E]ven *pro se* litigants must follow rules of civil procedure[.]").

Most of Clay's response takes issue with Defendant's characterization of the video of the altercation. Although argumentative, the Court has considered Clay's objections. But in the end, the video itself – not either party's characterization of the events depicted in the video – controls. *See, e.g., Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016) (relying primarily on video from

dashboard camera of police vehicle); *Holm v. Vill. of Coal City*, 345 F. App'x 187, 190 (7th Cir. 2009) (considering record evidence rather than party's characterization of evidence). The Court can see for itself (and did see for itself) what the video shows.

For the non-video evidence, Clay did not counter Defendant's facts by offering any facts of his own, backed by admissible evidence. At the summary judgment stage, naked denials are not enough. A party must present evidence, not mere disagreement. Accordingly, the Court accepts as true all assertions in the Statement of Facts to the extent that they are supported by the record. *See McGuire v. United Parcel Serv.*, 152 F.3d 673, 675 (7th Cir. 1998) ("An answer that does not deny the allegations in the numbered paragraph with citations to supporting evidence in the record constitutes an admission.").

Nonetheless, the Court has interpreted Clay's filings in this case generously in light of his *pro se* status. The Court has construed the evidence in the light most favorable to Clay, and drawn all reasonable inferences in his favor, since he is the non-moving party. The Court will not, however, dig through the summary judgment record to identify disputed issues of fact or find evidentiary support for any asserted disputes. *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003) ("We have repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," given the amount of material typically generated through the discovery process.). The Court will not hunt through the record, searching for evidence in Clay's favor.

The Court is mindful that "a nonmovant's failure . . . to comply with Local Rule 56.1 does not automatically result in judgment for the movant. The ultimate burden of persuasion

remains with [the movant] to show that [he] is entitled to judgment as a matter of law."
*Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006) (internal citation omitted).

With these standards in mind, the Court turns to the facts. Each fact recited below is undisputed, except as noted.

### Facts

In September 2015, Clay burglarized a home in Lansing, Illinois. *See* Statement of Facts, at ¶ 1 (Dckt. No. 52). During the break-in, the resident (hereafter, "Victim A") returned home. *Id.* Clay threatened Victim A with a hammer and took her money. *Id.* Clay then abducted Victim A and took her to the bank to use her debit card to get more money from her account. *Id.*

After stealing all of Victim A's available cash, Clay forced her into the trunk of her car and drove to the parking lot of a vacant commercial business. *Id.* at ¶ 2. Clay took Victim A out of the trunk and raped her in the back seat of the car. *Id.* Clay then strangled Victim A until she passed out on the ground in the parking lot. *Id.* After seeing that Victim A was still breathing, Clay doused her with lighter fluid and set her on fire. *Id.* at ¶ 3.

Victim A survived, but she sustained permanent and life-threatening injuries. *Id.* Clay was arrested and later confined at the Metropolitan Correctional Center of the U.S. Bureau of Prisons ("BOP") in Chicago. *Id.* at ¶ 4.

On April 3, 2017, Clay entered the office of a BOP case manager (hereafter, "Victim B") who worked at the MCC. *Id.* at ¶ 8. Clay pretended to make a complaint about another inmate to Victim B. *Id.* When Victim B reached for her phone to call a lieutenant about the problem, Clay grabbed her wrist to prevent her from dialing. He told her that he had a knife. *Id.* Unbeknownst to Victim B, he was even holding a written note that threatened her life:

6

> [Victim B's name.]  Listen here you little bitch.  I have a knife!!!
> If you wanna go home tonight you will do what I say.  If you try to
> push that button I promise you that before anybody can help you <u>I
> will kill you.</u>  Put your hands on the desk and don't move.  If you
> scream, I will kill you.  I'm getting life in prison anyway so I don't
> have anything to lose.  Please don't try me.  My intent is not to
> hurt you.

*Id.*

But Clay never gave the note to Victim B.  Instead, Clay pushed her to the floor.  He threatened her:  "Get on the ground or I will fucking kill you," or a phrase to that effect.  *Id.* at ¶ 10.  Clay threw Victim B's radio to the floor, and used Victim B's keys to lock himself inside the office with Victim B.  *Id.*

While Clay was locking the door, Victim B was able to reach the radio and call for help.  *Id.*  Clay heard Victim B call for help, became agitated, and put a homemade knife to Victim B's throat.  He repeated that he would "fucking kill" her.  *Id.*  Clay ordered Victim B to go back on the radio and tell other MCC staff members not to respond.  *Id.* at ¶ 11.

Victim B transmitted on the radio words to the effect of, "Don't respond. He has a knife. He's going to kill me."  *Id.*  Clay got on the radio himself and said words to the effect of, "I'm going to kill her if you come in.  Don't come in."  *Id.*  Clay ordered Victim B to get back on the floor, face down, which she did.  *Id.* at ¶ 12.  Clay straddled Victim B, grabbed her by the hair, and put the knife to her throat.  *Id.*

Defendant Williams responded to the emergency call and quickly arrived at the door to the office.  Williams worked for the BOP as a lieutenant at the MCC, and served as a shift supervisor.  *Id.* at ¶ 5.  Williams knew who Clay was, and based on the local news, he knew that Clay had allegedly kidnapped and raped Victim A, before setting her on fire.  *Id.* at ¶ 6.

7

Williams looked through a window and saw that an inmate was holding a knife to Victim B's throat. *Id.* at ¶ 13. Another MCC staff member, who was also outside of Victim B's office door, ordered Clay to drop the knife and come to the door. *Id.* at ¶ 12. Clay refused. *Id.* Because he did not have a key to the office, Williams then attempted to deploy his pepper spray under the door, but most of the spray came back at the officers. *Id.* at ¶ 14.

A correctional counselor arrived with the key and opened the door. *Id.* When the door flung open, Williams recognized Clay as the attacking inmate. *Id.* at ¶ 15. He saw Clay on top of Victim B, straddling her, with a knife to her neck. *Id.* Williams believed that Clay might have been attempting to remove Victim B's pants while holding a knife to her throat. *Id.* at ¶ 16. Multiple MCC staff members, including Williams, entered Victim B's office and deployed their cannisters of pepper spray. *Id.* at ¶ 14. MCC staff members pulled Clay off of Victim B and removed her from the room. *Id.*

After deploying the pepper spray, Williams and other MCC staff scuffled with Clay, who didn't go down quietly. He was still fighting and, most importantly, he was still holding the knife. *Id.* at ¶ 17. A struggle ensued. The BOP employees successfully disarmed Clay and placed him in handcuffs. *Id.* During the struggle, it was difficult to see because of the amount of pepper spray in the air. *Id.*

Clay disagrees that a scuffle preceded his handcuffing. According to him, when the door opened, he "dropped the knife and submitted to the restraints." *See* Pl.'s Resp., at ¶ 17 (Dckt. No. 56). He asserts in his opposition brief that the officers "beat" him after he was handcuffed. *See* Pl.'s Mem., at 1 (Dckt. No. 57). But his testimony was more constrained. Clay didn't exactly testify that the officers actually beat him. Instead, he testified that, while they were

restraining him, he "felt that [he] was being hit" all over his face, ribs, and stomach, and he also

felt knees "holding [him] down." *See* Clay Dep., at 24:23 – 25:14 (Dckt. No. 52-2, at 89 of 111).

So, Clay "felt" like he was being hit while they were restraining him. *Id.*

At deposition, Clay described the feeling of being pinned down. He felt "guys" and "four

or five people" restraining him. But he didn't testify that Williams hit him:

> Q: What happened next after you were in handcuffs?
>
> A: I felt the guys – because I couldn't – my vision was blurry, because I had been sprayed, but I felt that I was being hit, that my body was being attacked. And this happened, I probably stayed in that office after I was cuffed for probably ten minutes.
>
> Q: Where did you feel like you were being hit?
>
> A: All over, my face, I could feel it in like my ribs, my stomach, that area, my back. Somebody was – it was like four or five people. I felt knees all over me, you know, like they was holding me down with knees and all of that stuff. The only person that I could actually make out was the lieutenant, was Lieutenant Williams.

*See* Clay Dep., at 24:23 – 25:14 (Dckt. No. 52-2, at 89 of 111).

After Clay was in handcuffs, Williams began to feel overcome by the pepper spray. *See*

Statement of Facts, at ¶ 18 (Dckt. No. 52). He ordered the other BOP employees to bring Clay

down the stairs to the elevator, and Williams left the room to escape the pepper spray. *Id.*

Williams did not issue any orders about how to bring Clay down the stairs. *Id.*

The rescue took about 90 seconds. Video footage from a common area reveals that

Williams arrived in the vicinity about a minute and a half before rescuing Victim B. *Id.* at ¶¶ 20-

21. Williams exited the area about one minute after the rescue. *Id.* at ¶ 22. (Video from inside

the office where Clay carried out his attack is unavailable.)  Williams then went to a nearby sink to flush his eyes and wash off the pepper spray.  *Id.*

The video also shows other guards – not Defendant Williams – taking Clay away less than two minutes after the rescue.  *Id.* at ¶ 23.  The guards pulled Clay down a set of eight stairs on his back, but his head did not come into contact with the stairs.  *Id.* at ¶ 24.  Williams was not one of the people transporting Clay down the stairs.  *Id.*  Clay, however, states that Williams dropped him in front of the stairs, and that he was dragged down the stairs "face first," as Williams directed.  *See* Pl.'s Mem., at 1 (Dckt. No. 57).  But the video shows his feet and knees pointed up, not down.  *See* Def.'s Rule 56.1 Statement of Facts, Ex. 9 (Dckt. No. 52).  That is, the video shows Williams going down the stairs on his back, not "face first."

Video shows that the guards placed Clay in front of an elevator, which he then entered.  *See* Statement of Facts, at ¶ 25 (Dckt. No. 52).  While waiting for the elevator, several BOP employees crowded around Clay and physically restrained him.  But the footage does not depict that he was assaulted while waiting for the elevator.  *Id.*  They restrained him like someone would be restrained after attacking a prison guard.

They took Clay for an immediate medical exam.  *Id.* at ¶ 26.  According to Clay, he was "assaulted again inside the elevator."  *See* Pl.'s Mem., at 2 (Dckt. No. 57).  He felt officers holding him down, "hitting my body," and his request to have a shirt removed from over his face was ignored.  *See* Clay Dep., at 28:2-15 (Dckt. No. 52-2, at 90 of 111).  After receiving medical treatment, Clay walked unassisted to a segregation cell.  *See* Statement of Facts, at ¶ 26 (Dckt. No. 52).

All things considered, Clay suffered modest injuries, at most. His only injuries were mild abrasions to his head and upper torso, as confirmed by photographs. *See* Statement of Facts, at ¶ 27 (Dckt. No. 52).

Clay does not even try to dispute the fact that his injuries were slight. In fact, the statement about his modest injuries in the Statement of Facts is the *only* paragraph that elicited no response from Clay. He skipped it entirely. *See* Pl.'s Resp., at 2 (Dckt. No. 56) (omitting any response to paragraph 27, but responding to paragraphs 25–26, and 28–30). So Clay admitted that he had no significant injuries.

The parties dispute what happened to Clay's MP3 player, but only Defendant offers any evidence. According to Williams, he did not discard or destroy any of Clay's property. *See* Statement of Facts, at ¶ 28 (Dckt. No. 52). As Clay tells it, another inmate told him that he saw Williams destroy his MP3 player by throwing it against a wall. *See* Pl.'s Resp., at ¶ 28 (Dckt. No. 56). But Clay doesn't offer any testimony from that inmate. And Clay doesn't offer his own testimony on that point, either. Just unsworn hearsay.

Clay later testified that he kidnapped Victim B in an attempt to commit suicide. He hoped that the police would subdue him with lethal force. *See* Statement of Facts, at ¶ 36 (Dckt. No. 52). So, he tried to precipitate a fatal injury, not cuts and bruises.

The day after the attack, Clay was transferred to a prison in Kankakee County, where he remained for over two months. *Id.* at ¶ 29. He was later transferred to a BOP facility in New York City. *See id.* at ¶ 30. On September 7, 2017, more than five months after the attack, Clay sent letters to the MCC Chicago, alleging that he was beaten and his belongings were confiscated. *Id.* at ¶ 33. Those letters were the first written notice of a potential claim. *Id.*

11

Clay later brought this lawsuit under *Bivens* against Williams, claiming that he used excessive force during the hostage situation. Clay alleged that: (1) he was beaten while handcuffed for ten minutes inside the office where he had held Victim B captive; (2) he was dragged face-first down the stairs and that Williams made sure that he hit his face and head on the stairs; (3) he was assaulted outside the elevator; and (4) he was assaulted again once inside the elevator. *See* Dckt. No. 9. Clay also claimed that Williams unlawfully destroyed his property. He had property in his cell, but never saw it again. Other inmates told him that Williams had smashed his MP3 player against the wall. *Id.*

Based on these allegations, Judge Shah (the presiding District Judge before reassignment) allowed Clay to proceed on an excessive force claim against Williams. *See* Dckt. No. 8. The Court dismissed all other claims, including the property damage claim. *Id.*

Williams now moves for summary judgment on the excessive force claim.[1]

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *Anderson*, 477 U.S. at 256.

---

[1] Clay also sued Officer Brussette, but based on the docket, she was never served with process. *See* Dckt. No. 12. So this motion involves the only claim against the only Defendant (Lt. Williams).

The Court construes all facts and reasonable inferences in the light most favorable to the nonmoving party. *Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *Celotex Corp.,* 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772-73 (7th Cir. 2012).

Summary judgment is the time for a party to put its evidentiary cards on the table. "Summary judgment is 'not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.'" *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005)); *see also Caisse Nationale de Credit v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996) ("A party seeking to defeat a motion for summary judgment is required to 'wheel out all its artillery to defeat it.'") (citation omitted). If Clay had evidence in his favor, summary judgment was the time to offer it.

### Discussion

Williams moves for summary judgment on the excessive force claim on three grounds. First, Williams argues that he used objectively reasonable force during the hostage situation. Second, he asserts qualified immunity. And third, he argues that Clay failed to exhaust his administrative remedies. *See* Def.'s Mem. of Law, at 7–11 (Dckt. No. 51). Defendant also

13

addresses the due process claim based on the destruction of property, even though Judge Shah screened out that claim. *See id.* at 11–14.

Based on the undisputed facts, Williams is entitled to summary judgment because he used objectively reasonable force, and because he is protected by qualified immunity. There is sufficient grounds to grant the motion, so this Court does not reach the issue of exhaustion.[2]

## A.    Excessive Force

All too often, excessive force cases are poor candidates for summary judgment. In many cases, there are issues of fact about what took place, and whether the use of force was appropriate. *See Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010).

But not always. The Seventh Circuit has emphasized that "[w]hether a particular use of force was objectively reasonable 'is a legal determination rather than a pure question of fact for the jury to decide.'" *Dockery v. Blackburn*, 911 F.3d 458, 464 (7th Cir. 2018) (quoting *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 520 (7th Cir. 2012)); *see also Fitzgerald v. Santoro*, 707 F.3d 725, 733 (7th Cir. 2013); *Catlin v. City of Wheaton*, 574 F.3d 361, 367 (7th Cir. 2009).

---

[2] Williams should note, however, that he should have raised and litigated the exhaustion issue much earlier in this case. Defendant bears the burden of demonstrating non-exhaustion. *Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013). An inmate must exhaust administrative remedies that are "available" to him. 42 U.S.C. § 1997e(a). Prison authorities may not affirmatively mislead an inmate regarding available procedures. *See Twitty v. McCoskey*, 226 F. App'x 594, 596 (7th Cir. 2007). Whether Clay failed to exhaust his administrative remedies here would turn on whether the direction that he says he received from officials at the facility in Kankakee County rendered administrative remedies "unavailable" to him. Obviously, this is a fact issue. But Williams did not raise the exhaustion issue until the summary judgment stage, after the conclusion of discovery. The Seventh Circuit has instructed that the best practice is to resolve the issue of exhaustion at the start of the case, before pretrial discovery begins. *See Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008). Early resolution of the exhaustion issue both comports with the PLRA and promotes judicial economy by potentially allowing the parties to avoid the cost of discovery altogether. *Id.* The Court nevertheless does not reach the exhaustion issue – including whether the defense was waived – because it grants the motion on other, independently sufficient grounds.

There is no special set of summary judgment rules for excessive force claims. Normal rules apply. So if countervailing evidence is lacking, it's lacking. Summary judgment is proper when there is no genuine issue of material fact between the parties, or when Plaintiff's version of events is accepted as true, and no reasonable jury could find that the use of force was excessive. *See, e.g., Catlin*, 574 F.3d at 367; *Williams v. Brooks*, 809 F.3d 936, 944 (7th Cir. 2016).

Clay has no quarrel with any force used against him **before** he was handcuffed. He states that "my complaint is only as to what happened <u>after</u> I was in cuff." *See* Pl.'s Mem., at 1 (Dckt. No. 57) (emphasis in original). That concession makes sense. It was unavoidable. Clay created an exceptionally dangerous situation, and Williams and the others sprang into action to save a colleague's life. They acted in the heat of the moment, and in the end, Clay suffered no serious injuries. They used reasonable force to restrain him, as even Clay admits.

Here, Clay has abandoned or modified several of the allegations in the complaint, presumably because the video evidence proves them to be false. For starters, Clay no longer maintains that the officers beat him for ten minutes. *See* Pl.'s Mem. (Dckt. No. 57). The video shows that Williams was at the office for no more than two and a half minutes *total*, and that he left the office about one minute after the hostage rescue. *See* Statement of Facts, at ¶¶ 20–22 (Dckt. No. 52). Plus, the video also shows other guards taking Clay away from the scene less than two minutes after Victim B's rescue. *Id.* at ¶ 23. Clay also no longer asserts that he was assaulted outside the elevator; instead, it was "near" the elevator. *See* Pl.'s Resp., at 2 (Dckt. No. 56). The video footage shows no assault outside or "near" the elevator. *Id.* at ¶ 25.[3]

---

[3] The government provided a courtesy copy of the video to the Court's chambers, and the Court watched the video. The government cited the video as exhibit 9 to the Rule 56.1 statement, but did not file a copy of the video with the Clerk's office. *See* Statement of Facts, at ¶¶ 20–26 (Dckt. No. 52); Def.'s App'x of Exs. to Statement of Facts (Dckt. No. 52-1) (naming "Disk of MCC Surveillance Video" as Exhibit 9);

But Clay does persist in contending that he was dragged face-first down the stairs and that Williams made sure that he hit his face and head on the steps. *See* Pl.'s Mem., at 1 (Dckt. No. 57). The video evidence shows otherwise. Plaintiff's story is just a story, supported by no evidence – and contradicted *by* the evidence.

Here, the video unequivocally shows that Clay was pulled down the stairs on his back. *See* Def.'s Rule 56.1 Statement of Facts, Ex. 9 (Dckt. No. 52). He did not hit his face or head on the stairs. And most importantly, Williams was not with the group of individuals who transported Clay down the stairs and away from the pepper spray. *See* Def.'s Rule 56.1 Statement of Facts, at ¶ 24. Williams did not use excessive force because he didn't exercise any force at all. He wasn't even there. *Id.* Summary judgment is permissible if one story is "blatantly contradicted by the record, so that no reasonable jury would believe it . . . ." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that party's position was contradicted by videotape of incident, requiring the court to reject party's position on what occurred and instead rely on the videotape); *Johnson v. Moeller*, 269 F. App'x 593, 596 (7th Cir. 2008) (summary judgment upheld for defendant on excessive force claim where security-camera footage belied Plaintiff's version of events and demonstrated reasonableness of force used).

Clay alleges that Williams directed the MCC employees to hit his face on the stairs. But that makes no difference. The point is that he did not hit his face on the stairs at all, because he went down on his back. The video showed the falsity of Clay's story. No reasonable jury could find otherwise.

---

Def.'s Exs. to Statement of Facts, at 47–49 of 111 (Dckt. No. 52-2) (skipping from Exhibit 8 to Exhibit 10). So the Court has directed the government to file a copy on the docket. *See* Dckt. Nos. 72, 76. Still, the omission falls in the "no harm, no foul" category. The Court did receive a copy in chambers, and Clay received a copy, too.

That leaves two components of Clay's excessive force claim. Clay argues that Williams assaulted him in the 60 seconds while he was handcuffed (after the rescue, but before leaving the office). He also claims that he was assaulted in the elevator.

The Court views the evidence in the light most favorable to the non-moving party, and draws all inferences in his favor. Williams argues that he is nonetheless entitled to summary judgment. *See* Def.'s Reply, at 5-8 (Dckt. No. 60); *see also Dockery*, 911 F.3d at 464; *Fitzgerald*, 707 F.3d at 733; *Catlin*, 574 F.3d at 367; *Williams*, 809 F.3d at 944. The Court agrees.

The Due Process Clause of the Fourteenth Amendment governs a claim of excessive force by a pretrial detainee. *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2475 (2015). To succeed, a pretrial detainee must show that the "force purposely or knowingly used against him was objectively unreasonable." *Id.* at 2473. A court must make this determination "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.*

An officer is not required to use the least amount of force possible to restrain an inmate. Rather, the force must be reasonable under the circumstances. *See Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003). Officers do not have the luxury of time, and they do not act in an adrenaline-free environment. Officers must make split-second decisions about the use of force in tense, uncertain, and rapidly evolving environments. *See Dockery*, 911 F.3d at 464. Especially when someone's life is on the line.

At the summary judgment stage, the question is whether a reasonable jury could find that a use of force was objectively unreasonable. That question depends on factors like (1) the

relationship between the need for the use of force and the amount of force used; (2) the extent of

the plaintiff's injury; (3) any effort made by the officer to temper or to limit the amount of force;

(4) the severity of the security problem at issue; (5) the threat reasonably perceived by the

officer; and (6) whether the plaintiff was actively resisting. *Kingsley*, 135 S. Ct. at 2473 (citation

omitted). The question is what a reasonable officer on the scene would have understood in that

moment, without the benefit of hindsight. *Id.*

      Here, all of the factors weigh heavily in favor of the reasonableness of the use of force.

In fact, the balancing is so lopsided that no reasonable jury could find in Clay's favor.

      Clay took a female BOP case manager hostage in the prison. He put a knife to her throat.

He threatened to kill her. And when Williams arrived on the scene, Clay was straddling the

victim with, again, a knife at her throat. Williams reasonably perceived that Clay may have been

attempting to remove his victim's pants, presumably to sexually assault her. And Williams knew

that Clay had previously kidnapped, raped, and strangled a different female victim before setting

her on fire in an attempt to kill her. It was eminently reasonable for Williams to reach the

obvious conclusion: a highly dangerous person was engaged in a violent act. It required

emergency action.

      Addressing a few of these factors in order, the Court starts with factor one – the

relationship between the need for the use of force and the amount of force used. *See id.* The

force that Williams allegedly used against Clay in both the office and elevator – hits to the head

and torso and restraining Clay with his knees – was very mild in comparison to the

overwhelming need for force, in light of the existing danger. And factor two, the extent of

Clay's injuries, also weighs in favor of Williams. Clay's injuries amounted to mild abrasions

and bruising to the face and upper torso. These injuries are consistent with the BOP employees' efforts to subdue Clay in Victim B's office. Clay presents no evidence to show that these injuries were caused by purely gratuitous violence after he meekly submitted in handcuffs, whether in Victim B's office or while he was in the elevator.

Factor three looks to the officer's effort to temper, or limit, the amount of force. Here, Williams tempered the amount of force he used. Recall Clay's end goal. He claims he was attempting to commit suicide by goading the MCC officers into killing him. He admits that his behavior posed such a clear and present danger that *lethal* force was not only warranted, but the end-goal. Getting *tackled* is reasonable when Clay sought to get *killed*.

As Clay himself admits, the initial use of force – before the handcuffing – was eminently reasonable. And no jury could think it was unreasonable for BOP employees to continue to subdue a dangerous, violent person even after he was handcuffed, or that the officers used unreasonable force in doing so. Clay testified that he "felt" like he was being hit all over and felt knees holding him down. *See* Clay Dep., at 24:23 – 25:14 (Dckt. No. 52-2, at 89 of 111). Given the circumstances, Clay's account is unsurprising – he was being subdued and immobilized by multiple officers after holding a prison employee hostage and threatening to kill her.

If Defendant Williams had actually hit Clay, it would have been easy for Clay to say so, squarely and directly. He could have testified, say, that Williams swung at him, or had a closed fist, or dealt him body blows, or smacked him in the face, or something along those lines. "He punched me," for example, is easy to say. But Clay offered no such testimony. Instead, he testified that getting restrained by a group of people (after threatening to kill someone) "felt" like

19

he was getting beaten. That's not enough to support a jury verdict that Williams used objectively unreasonable force.

At best, Williams has offered evidence that some amount of force was used against him while he was restrained. But he didn't offer evidence of unreasonable force. And he didn't offer any evidence that Williams, in particular, used unreasonable force. He testified that he could "make out" Williams amidst the pepper spray, but he didn't testify that he saw Williams hit him or gratuitously beat him. *See* Clay Dep., at 24:23 – 25:14 (Dckt. No. 52-2, at 89 of 111). Based on this evidence, no reasonable jury could conclude that Williams used objectively unreasonable force against Clay.

Factors four and five are intertwined here, assessing both the severity of the threat and the threat reasonably perceived by the officer. A detainee accused of one violent crime who has just committed another violent crime while in lock-up is clearly a serious threat. Handcuffing such a person would not necessarily ensure the safety of BOP employees. No jury would think that the BOP employees were safe just because Clay was in handcuffs. Using additional force was reasonable to ensure that Clay was not a danger to anyone else.

And finally, factor six favors Williams if Clay was actively resisting. In this case, Clay cannot create a genuine issue of fact by claiming that he did not resist once the officers opened the door. Even if Clay did not physically fight back once the officers entered the office, he continued to actively resist – just moments before – by refusing to drop the knife. He refused to come to the door, and barricaded himself in the locked office despite the pepper spray. The officers were not expected to stop on a dime and assume a placid inmate. *See Mason-Funk v. City of Neenah*, 895 F.3d 504, 510 (7th Cir. 2018) ("To drive home the point, it is worth

20

recounting what occurred in the short span of six minutes. Flathoff had continuously made threats that he would kill the hostages, which prompted the hasty team to act."); *Varnadore v. Merritt*, 778 F. App'x 808, 815 (11th Cir. 2019) (finding active resistance factor tipped for officers where suspect had previously refused to comply with their order to show his hands, even though the suspect was not actively resisting arrest when the officers shot him).

Based on the undisputed facts, no reasonable jury could find that Williams used excessive force on Clay after he was handcuffed in Victim B's office. Even if Clay had stopped all resistance, submitted to his restraints, and stopped fighting immediately, a reasonable officer would not have anticipated such a drastic and sudden change of behavior. With blood pumping in the heat of the moment, the officers would not have recognized the lion-to-lamb transformation for some period of time. Continuing to restrain a violent inmate – moments after an attack – was reasonable.

Clay insists that his "intention wasn't to hurt anyone." *See* Pl.'s Mem., at 2 (Dckt. No. 57). The knife to the throat suggested otherwise. So did the call for help from the victim. And Clay's threat to kill her. All available information told Williams that a fellow BOP employee's life was on the line, and the undisputed evidence is that he acted accordingly.

Clay's minor injuries – mild bruises and abrasions – are unrebutted evidence that the force was not excessive. If anything, the modesty of the injuries – after BOP officers had to forcibly subdue him – confirms that the officers acted with restraint and professionalism. "The extent of injury is relevant to the . . . inquiry because it provides some indication of the amount of force applied, and because it may suggest whether the use of force was plausibly necessary in

a particular situation." *McCottrell v. White*, 933 F.3d 651, 664 (7th Cir. 2019) (Eighth Amendment context).

The use of force on a restrained suspect, if tempered to keep him still and the officers safe, is typically not unreasonable in most circumstances. *See Abdullahi v. City of Madison*, 423 F.3d 763, 771 (7th Cir. 2005) ("just enough force to prevent an individual from 'squirming' or escaping might be eminently reasonable"). Here, again, to Williams and the other officers, Clay had just appeared poised to murder an MCC employee. No reasonable jury could conclude that handcuffing him was enough to ensure the safety of MCC employees, at least during the minutes after he was handcuffed. Thus, though Clay points to his bruises as evidence that the force against him was excessive, his mild injuries demonstrate that the force used was reasonable under the circumstances. And Clay has presented no evidence that he in fact received *any* of his mild injuries *after* being handcuffed. Clay can't make a *res ipsa loquitor* argument, arguing he couldn't have sustained these injuries unless he was beaten after being handcuffed. After all, Clay's injuries are entirely consistent with being disarmed, subdued, and restrained during the rescue of Victim B, when exceptionally high levels of force would have obviously been reasonable.

### B. Qualified Immunity

Even if his use of force could be considered objectively unreasonable (which was not the case), Williams is entitled to qualified immunity.

The doctrine of qualified immunity "'gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting

*Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). As applied to an excessive force claim, "the qualified-immunity doctrine gives enhanced deference to officers' on-scene judgments about the level of necessary force." *Dockery*, 911 F.3d at 466 (internal quotations omitted). "This is so because, even if the plaintiffs demonstrate that excessive force was used, they must further establish that it was objectively unreasonable for the officer to believe that the force was lawful – *i.e.*, they must demonstrate that the right to be free from the particular use of force under the relevant circumstances was 'clearly established.'" *Abbott v. Sangamon County*, 705 F.3d 706, 725 (7th Cir. 2013).

"Qualified immunity is an affirmative defense, and once raised, the plaintiff bears the burden of defeating it by showing: (1) the defendant violated a constitutional right, and (2) that the right was clearly established at the time of the alleged violation." *Sinn v. Lemmon*, 911 F.3d 412, 418 (7th Cir. 2018) (citing *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017)). "A failure to show either is fatal for the plaintiff's case." *Id.* at 418 (quoting *Archer*, 870 F.3d at 613).

The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). Instead, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see Dockery*, 911 F.3d at 466 ("[T]he precedent must be 'particularized to the facts of the case.'"). This principle is "particularly important in excessive force cases" because "[u]se of excessive force is an area of the law in which the result depends very much on the facts of each case." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam).

23

In fact, excessive force caselaw arising in non-hostage situations is not specific enough to warn officers about the legality of force used in a hostage situation. A hostage-taker has already demonstrated a propensity for violence and unpredictability, which makes the situation different from other cases. *See Mason-Funk v. City of Neenah*, 895 F.3d 504, 509 (7th Cir. 2018) ("Funk fails to cite to any precedent . . . which involved a hostage situation. *On this basis alone*, the remaining cases cited by Funk are factually distinct and incapable of giving the officers any fair warning that they violated a clearly established right.") (emphasis added).

Here, Clay failed to meet his burden to defeat a qualified immunity defense. Recognizing that Clay is *pro se*, however, the Court conducted its own search and located no precedential authority providing guidance on how a correctional officer must respond under the circumstances confronted by Williams while rescuing Victim B. The Court did locate Seventh Circuit authority prohibiting significant and gratuitous force against subdued suspects in certain circumstances. *See, e.g., Kingsley v. Hendrickson*, 801 F.3d 828, 832 (7th Cir. 2015) (concluding that a reasonable officer was on notice that a manacled, non-resisting suspect already lying on his back did not justify the use of taser); *Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014) (finding that a reasonable jury could have determined that the officer deliberately broke arrestee's jaw with knee when the arrestee no longer posed a threat, and was already lying spread eagle on the ground); *Rambo v. Daley*, 68 F.3d 203, 207 (7th Cir. 1995) ("The Constitution clearly does not allow police officers to force a handcuffed, passive suspect into a squad car by breaking his ribs.").

But those cases are distinguishable. The cases did not involve a suspect like Clay, who demonstrated an immediate willingness to harm law enforcement personnel. And they all turned

on the fact that the officers used unnecessary force against prisoners who were already restrained. In other words, there is no clearly established constitutional right for a detainee – who has just kidnapped and threatened to murder a prison employee – to be free from force beginning at the very instant that he stops fighting. He had no constitutional right to a "hands off" approach.

In sum, based on the undisputed facts, Williams enjoyed qualified immunity, even if (for the sake of argument) he exercised unreasonable force. *See Johnson v. Rogers*, 944 F.3d 966, 969 (7th Cir. 2019) ("Only when precedent places the invalidity of a particular action beyond debate may damages be awarded."). Williams's perspective in the moment was colored by Clay's prior actions. And moments earlier, Clay appeared poised to stab Victim B in the neck, a potentially fatal blow. Williams had no reason to assume that Clay had a change of heart, and no longer sought to kill or injure MCC employees. *See Townsend v. McWilliams*, 2019 WL 5618821, at *5 (S.D. Ind. 2019) (finding qualified immunity in light of the fact that a struggle had preceded the handcuffing).

## C. Property Deprivation

Under 28 U.S.C. § 1915A, Judge Shah pre-screened the due process claim based on deprivation of property, and dismissed the claim. *See* Dckt. No. 8. Williams nonetheless moved for summary judgment on the claim. *See* Def.'s Mem. of Law, at 11-14 (Dckt. No. 51). There is no need for this Court to grant summary judgment on a claim that it has already dismissed.

## Conclusion

Defendant Williams's motion for summary judgment [50] is granted. The Clerk of Court will enter final judgment for Defendant Williams and against Clay. Defendant Officer Brussette

is dismissed for failure to effectuate service of process  *See* Fed. R. Civ. P. 4(m).  This case is

closed.[4]


Date:   May 31, 2020

_____
Steven C. Seeger
United States District Judge

---

[4] If Clay wants to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment.  *See* Fed. R. App. P. 4(a)(1).  If Clay appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome.  *See Evans v. Ill. Dep't of Corr.*, 150 F.3d 810, 812 (7th Cir. 1998).  If the appeal is found to be non-meritorious, he could be assessed a "strike" under 28 U.S.C. § 1915(g).  If a prisoner accumulates three strikes because three federal cases or appeals have been dismissed as frivolous or malicious, or for failure to state a claim, the prisoner may not file suit in federal court without pre-paying the filing fee unless he is in imminent danger of serious physical injury.  *Id.*  If Clay seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* in this Court stating the issues he intends to present on appeal.  *See* Fed. R. App. P. 24(a)(1).